(169 App. Div. 588)

FABBRI v. MEYER et al. (No. 7695.)

(Supreme Court, Appellate Division, First Department. November 5, 1915.)

1. CONTRACTS ⬥9—BUILDING LINE—CERTAINTY.

> The agreement between the owners of three adjoining lots, Nos. 5, 7, and 9, that they would not build thereon, so as to bring the front line of any building or extension thereof on said premises beyond a front line established and laid down on the modified plans prepared by K. for said lot 7, now in course of construction according to said modified plans, is not unintelligible and void for uncertainty, though it may be open to construction—there being then a dwelling on each lot; K., contractor, having been

employed to make alterations, including the erection of a new front wall, in that on lot 7; application, in the name of S., architect, to the building department for approval of plans for the alterations, having been filed, such plans, then filed, and modified plans, later filed, bearing only S.'s name; neither of the plans showing a line designated as a front line, but the original plans showing one designated as "(new) building line," marking the line of the front wall, beyond which, however, bay windows, from the second story to the top, projected a considerable distance; and a reduction of the projection of the bay windows, to an amount then agreed on, and then roughly drafted, as shown on modified plans subsequently made and filed, in accordance with which the work was subsequently done, being the occasion of the agreement—the parties intending to refer to the plans, with the modifications subsequently filed, in accordance with which the alterations were made.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 10–20; Dec. Dig. ☞9.]

2. VENDOR AND PURCHASER ☞228—BONA FIDE PURCHASER—AGREEMENT AS TO BUILDING LINE.

If the agreement between owners of adjoining lots as to front building line be valid, purchasers of some of them by deeds expressly declaring their lots subject thereto are not bona fide purchasers without notice, because of their belief of its invalidity.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 495–501; Dec. Dig. ☞228.]

Appeal from Special Term, New York County.

Action by Edith Fabbri against Anna C. Meyer and another. From a judgment for plaintiff, entered on a decision after a trial, defendant Meyer appeals. Reversed and remanded.

See, also, 152 N. Y. Supp. 1109; 158 App. Div. 914, 143 N. Y. Supp. 1116.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Samuel F. Moran, of New York City, for appellant.
Russel R. Vaughn, of New York City, for respondent Fabbri.
Stanley W. Dexter, of New York City, for respondent Taylor.

McLAUGHLIN, J. The plaintiff is the owner of the premises No. 15 East Sixty-Fourth street, and the defendants Meyer and Taylor are the owners of Nos. 17 and 19 East Sixty-Fourth street, respectively. On March 9, 1896, the then owners of these three lots executed an agreement, by which they mutually covenanted and agreed with each other not to move, erect, construct, or cause or permit to be moved, erected, or constructed, any building or structure of any character or description upon any part of the said premises "so as to bring the front line of any building or extension thereof on said premises beyond a front line established and laid down upon the modified plans prepared by A. Kimbel & Sons for the said premises No. 17 East Sixty-Fourth street, now in course of construction according to said modified plans." The agreement was recorded, at the request of the defendant Meyer, on July 22, 1896. This action was brought to have the agreement declared void for uncertainty and

to cancel the same of record, and from a judgment to that effect the defendant Meyer appeals to this court.

[1] There is no uncertainty about this agreement, upon its face, and the essential object which the parties had in mind is perfectly clear. Although loosely expressed, it sufficiently appears that when the agreement was executed building operations were in progress on No. 17, and the parties desired to provide against any further structure on any of the three lots being extended any further front (i. e., nearer the street) than the front of the building then in the course of construction. It appears from the evidence, however, that in December, 1895, application was made to the building department of the city of New York for the approval of plans for the alteration of the existing building on No. 17 East Sixty-Fourth street, which included the removal of the front wall and the erection of a new one. The application was made in the name of G. A. Schellenger, architect, with the authorization of the then owners, the defendant Meyer and Elizabeth M. Meyer. All the plans for the alterations filed then and subsequently bore his name, and the name of A. Kimbel & Sons did not appear on any of them. No modifications of the plans were filed until April 2, 1896, nearly a month after the date of the agreement, and none of the plans filed showed any line designated as a front line. There was an inconspicuous line upon the original plans, designated as "(new) building line," which was some 4 feet 9 inches back of the lot line, and which marked the line of the front wall. Beyond this line, however, there were some slight projections, and from the second story to the top of the house a bay window projected a considerable distance.

It is claimed by the respondents that the plans filed by Schellenger cannot be identified as the plans referred to in the agreement and described as the modified plans prepared by A. Kimbel & Sons, and that, even if they could be, no front line is shown, and it is utterly impossible to determine the restriction intended to be imposed. When the circumstances under which the agreement was executed are taken into consideration, however, most of the alleged uncertainty disappears. Each of the three adjoining lots was then, and has since been, occupied by a house four stories high, used as a private residence. In 1895 the Misses Meyer employed the firm of A. Kimbel & Sons to make extensive alterations to their house. Kimbel & Sons employed Schellenger, as an architect, to make the technical drawings, and he saw that the requirements of the building department were complied with. The owners of the adjacent houses, Nos. 15 and 19, were, from the first, apprehensive lest the Meyer house should be built out beyond the fronts of their houses, and negotiations were entered into which resulted in the agreement in question. According to the original plans, the bay window commencing at the second story was to have overhung the front wall of the first story by some 3½ feet; but about the time the agreement was entered into arrangements were made to have the projection of the bay window reduced, and this modification was shown upon the drawings filed April 2d. As thus reduced, it projects about the same distance as

the bay windows of the adjoining houses, and the front walls of the first stories of the three houses are also practically in line.

Kimbel testified that he first told the adjoining owners that the house was to be extended to the extreme building line; that they protested, with the result that the owners of No. 17 finally agreed to change their plans. He could not state positively when the alteration in the bay window was agreed upon, but it had certainly been discussed, and he had made a rough drawing showing the alteration, before the agreement was executed. In referring in the agreement to the modified plans prepared by A. Kimbel & Sons, in accordance with which construction was then going on, it seems to me that the parties unmistakably intended to refer to the plans in accordance with which the alterations were subsequently made. It is quite conceivable that they were not familiar with the technical drawings made by Schellenger, nor with the requirements of the building department, so that the description in the agreement is not an accurate description of the plans and modifications filed in the building department. But the house was then "in course of construction" according to "plans prepared by A. Kimbel & Sons for the said premises." Modifications in the proposed alterations had been assented to, after discussion with the adjoining owners, and the change in the bay window had been discussed and sketched, whether the detailed drawings had been prepared prior to the agreement or not. It is not claimed that any other changes were made after the date of the agreement, or that there were ever any other plans in existence, in accordance with which the alterations were made.

In the light of the surrounding circumstances, therefore, there can be no doubt that the parties intended to refer to the plans, with the modifications subsequently filed and approved, in accordance with which the alterations were being made. They were unquestionably familiar with at least the general features of these plans, and there were no other plans to which they could have referred. It is quite true that upon none of the plans is there any front line, established and laid down as such, and it is difficult to determine precisely what construction should be given to these words. But it would be equally difficult to determine precisely what was meant by the "front line of any building or extension thereof," which the agreement provided should not be brought beyond the front line of the plans.

If the parties had waited until the alterations to No. 17 had been completed, and had then agreed not to build beyond the "front line" of the house, there would be the same uncertainty as to the precise extent of the restriction. Yet no one would think of suggesting that such an agreement would be void and could be canceled of record. The present agreement was executed when the alterations had just been commenced, and the parties accordingly expressed the restriction by referring to the front line established by the plans. In so doing, it seems plain to me that they had in mind the front line of the house, after it had been completed, and that the agreement should no more be declared void for uncertainty in the one case than in the other.

Whether these words should be construed as referring to the line

of the front wall, the "(new) building line," or to the extreme front of the projecting bay window, they were certainly intended not to permit any building in front of the latter line, and I do not think that we are called upon to determine the precise extent of the restriction in the present action. Such a determination is involved in the respondents' demand for judgment, in case the agreement should be held to be enforceable, directing the defendant Meyer to remove encroachments beyond such front line. But the defendant Meyer's house is practically on a line with the others, and was built in accordance with the plans referred to in the agreement. It is not claimed that any additional projections were then, or have since been, placed upon it, and the construction of the house in accordance with the plans referred to in the agreement must necessarily be held to have been sanctioned by the agreement.

The relief sought and obtained in the present action is a judgment declaring the agreement void and canceling it of record, so that any of the owners may be free to build as close to the front of his property as he chooses, without any restriction whatever. Such a result can be obtained only, as the court below has done, by declaring the agreement unintelligible. It is not claimed, however, that the reference in the agreement to "the front line of any building or extension thereof on said premises" is unintelligible; and if I am right in my conclusion that in referring to the front line on the plans the parties meant to refer to the front line of the house when altered in accordance with the plans, the agreement is not unintelligible and cannot be declared void. It may be open to construction, but the occasion for construing it has not arisen, and may never arise.

Courts are loath to declare an agreement void for uncertainty, and an extreme example may be found in the case of Hitchcock v. Galveston, 3 Woods, 287, Fed. Cas. No. 6,534. In that case suit was brought upon a paving contract, which contained the provision that:

"All the above work is to be done and executed in accordance with the specifications of the city engineer, now on file in the mayor's office."

It was pleaded as a defense that no such specifications were ever prepared or filed, and, on demurrer, this defense was overruled by Justice Bradley, who said, referring to the specifications:

"Their actual presence in the office at the time of executing the contract was not a material circumstance, if they had been prepared and were then in existence. The identity of the specifications referred to would be ascertained by extrinsic evidence."

He also held that, even if the specifications were never prepared, the contract was not void for lack of certainty, saying:

"I am inclined to think that the contract in this case was capable of substantial performance without the specifications."

In the present case the three houses have stood for nearly 20 years, with their front walls and projecting windows on substantially the same line. The object of an agreement of this kind invariably is to prevent one owner from building in front of the others. That was undoubtedly the object of the agreement in question, and in order to

declare it void we should be obliged to consider only its superficial inaccuracies and shut our eyes to its essential purpose.

[2] The claim that the plaintiff and the defendant Taylor are in the position of bona fide purchasers without notice seems to me to be entirely unfounded, because each took title under a deed expressly declaring his premises to be subject to the agreement. Whatever inquiries they did or did not make, or however strong may have been their belief that the agreement could not be enforced, their titles are expressly subjected to the agreement, if there is any valid agreement. Having taken title subject to the restriction, neither of them can assert his belief that the agreement was invalid as a legal or equitable reason for relieving him of the restriction. Their diligence or negligence in examining the agreement is entirely immaterial.

The judgment appealed from should therefore be reversed, with costs, and, since there is no occasion for ordering a new trial, the findings of fact made at the request of the plaintiff, numbered X to XIX, inclusive, and XXII to XXIX, inclusive, and the findings of fact made at the request of the defendant Taylor numbered III to. X, inclusive, and all the conclusions of law, except that numbered VIII, made at the request of the plaintiff, should be reversed, and the findings of fact, numbered XV, XVII, and XVIII, and the conclusions of law requested by the defendant Meyer, should be found, and judgment directed accordingly. All concur.